**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: SACR 16-00029-CJC |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANT WALTON'S MOTION FOR A JUDGMENT OF ACQUITTAL** |
| KEITH MARVEL WALTON, | |
| Defendant. | |

# I. INTRODUCTION

On September 22, 2017, after a four-week trial, the jury found Defendant Keith Marvel Walton guilty of the following charges: (1) aiding and abetting or conspiring with others to commit Hobbs Act robbery at Westime in West Hollywood, California

("the Westime robbery"); (2) aiding and abetting or conspiring with others to commit Hobbs Act robbery at Ben Bridge Jeweler in Torrance, California ("the Del Amo robbery"); (3) aiding and abetting or conspiring with others, who knowingly brandished a firearm during and in relation to the Del Amo robbery; (4) aiding and abetting or conspiring with others to commit Hobbs Act robbery at Ben Bridge Jeweler in Santa Monica, California ("the Santa Monica robbery"); and (5) conspiracy to commit Hobbs Act robbery. Walton now moves to set aside the jury's guilty verdict for conspiracy, three robberies, and brandishing a firearm during the Del Amo robbery, arguing that there was insufficient evidence to support that verdict. The Government opposes Walton's motion, contending that Walton's planning role and participation in the three robberies, as well as the foreseeability that a gun would be used in the Del Amo robbery, are sufficient to support the jury's guilty verdict. The Court agrees with the Government. There was sufficient evidence to support the jury's guilty verdict on all five counts. Walton knowingly aided and abetted the three robberies, he intentionally participated and joined in the conspiracy to commit those robberies, and it was reasonably foreseeable to him that a firearm would be used by one of his co-conspirators during the Del Amo robbery. Accordingly, the Court DENIES Walton's motion for acquittal.

## II. BACKGROUND

The operative Third Superseding Indictment charged Walton with conspiracy to commit Hobbs Act robbery (Count One), three counts of Hobbs Act robbery (Counts Nine [Westime, West Hollywood], Eleven [Ben Bridge Jeweler, Torrance], and Fourteen [Ben Bridge Jeweler, Santa Monica]), and two counts under 18 U.S.C. § 924(c) with brandishing enhancements (Counts Ten [Westime, West Hollywood] and Twelve [Ben Bridge Jeweler, Torrance]). (Dkt. 537.) The grand jury returned Walton's indictment along with indictments for several co-defendants who were charged with similar counts. The charges arose from a series of "smash and grab" robberies that occurred at jewelry

stores across Southern California. After a four-week jury trial, the jury convicted Walton of all counts charged against him except Count Ten.

Viewed in the light most favorable to the Government, evidence at trial showed the following related to Walton and the charged crimes:

**A. The Westime Robbery**

On February 16, 2016, both Robert Johnson and Jameson LaForest asked Wilson Elima to join a planning meeting for the Westime robbery at Walton's house. (Dkt. 923 [Transcript 8/22/17 Vol. II] at 76:18-77:1, 77:8-78:6, 78:21-23.) Elima picked up LaForest and drove to Walton's house, (*id*. at 78:19-23, 86:16-25), where they met with Walton, Johnson, and Darrell Dent, (*id*. at 80:2-8, 87:3-6).[1] The men gathered in the living room and discussed how the robbery would "go down." (*Id*. at 80:9-13, 87:7-14; Dkt. 970 [Transcript 8/31/17 Vol. II] at 23:2-25:3.) The meeting lasted about 45 minutes. (Transcript 8/22/17 Vol. II at 83:20-22.) During this meeting, Walton told Elima about the robbery. (*Id*. at 80:14-82:8.) Walton told Elima that he and Dent had "scoped" out the robbery location, (*id*. at 80:15-17), and that if Elima did his job "right," he could make $15,000, (*id*. at 80:17-18, 82:24-83:4). Walton also explained to Elima that a "plug," a person who buys stolen goods, would purchase the stolen watches after the robbery. (*Id*. at 81:17-82:8.) Dent testified that the men discussed "[t]he type of clothing participants may use," "the guy that would be used to control the guard or hold the guard down," and "the exit routes." (Transcript 8/31/17 Vol. II at 24:3-6.) Dent also testified that the men discussed what would happen if Dent was not going to be available to meet the "plug"–"Mr. LaForest would drive the watches over the hill . . . [a]nd Keith Walton

---

[1] There was a discrepancy between Elima's testimony that Dent was at this meeting, and the cell site data presented by FBI Special Agent Boles that placed the phone associated with Dent in Anaheim during the time when the meeting was held.

would coordinate LaForest and the buyer together." (*Id*. at 25:1-3.)

After meeting, the men left Walton's house to commit the robbery. (Transcript 8/22/17 Vol. II at 87-95.) Elima drove Johnson to various stores so that Johnson could purchase hammers for the robbery. (*Id*. at 87:13-89:11.) Johnson and Elima also stopped at a motorcycle store where Johnson bought some "ninja masks" that the robbers would use to cover their faces. (*Id*. at 90:12-91:11.) Elima then drove back to Walton's house, where he dropped off Johnson and picked up LaForest. (*Id*. at 91:12-92:2.) Elima and LaForest then drove to Queen Park. (*Id*.) Elima, LaForest, Justin Henning, Johnson, and three other men met at the park. (*Id*. at 92:3-94:22.) The men waited for a getaway driver to arrive, (*id*. at 94:23-95:9), and while waiting Elima ended up asking LaForest to take him to work because he was going to be late, (*id*. at 95:10-15).[2] LaForest did drop Elima off at work, but took Elima's car to use in the robbery. (Transcript 8/22/17 Vol. II at 103:3-19.) Later in the day, Elima texted Walton, asking him to not "leave [Elima] hanging" if the robbery was completed because they were using his car. (Transcript 8/22/17 Vol. II at 103:20-105:3.) Walton responded "You are in good hands." (*Id*. at 105:4-14; Ex. 135-X.) Later that evening, LaForest picked Elima up from work, and told Elima that the robbery was attempted but not completed, and that "tomorrow would be the day, just be ready." (Transcript 8/22/17 Vol. II at 108:13-109:3; *see also* Transcript 8/31/17 Vol. II at 25:16-22.) Elima testified that the attempt involved the use of a gun. (Dkt. 930 [Transcript 8/25/2017] at 34:16-35:16.)

FBI Special Agent Boles testified that the phones associated with Elima, LaForest, Walton, and Johnson, were all in the vicinity of Walton's house from 8:00 a.m. to 9:00 a.m. on February 16, 2016. (Dkt. 1054 [Transcript 9/12/17 Vol. I] at 130-33.) Moreover,

---

[2] Around this time, Elima sent his girlfriend a message through Facebook messenger that said "just meet up with homies" and indicated that they had been discussing things and Elima thought they were "lollygagging." (Transcript 8/22/17 Vol. II at 100:1-21; Exs. 66D, 66E.)

Boles testified that the phones associated with LaForest and Johnson were in the vicinity of Westime that evening and communicated with one another during that time. (*Id*. at 36-38.) Boles also testified that the phone associated with Dent was in the area of Anaheim, California when the meeting occurred, (*id*. at 101:9-22), and that this phone made a number of calls with the phones associated with Walton, Johnson, and LaForest during the 8:00 a.m. to 9:00 a.m. hour, (Ex. 208 at 293).

On February 17, 2016, LaForest texted Elima, (Transcript 8/22/17 Vol. II at 109:4-8), and Elima called LaForest and told him that he could not make it to the robbery because he had to take his uncle somewhere, (*id*. at 111:21-112:8). About six minutes later, Johnson called Elima and told Elima he was "the last piece to the puzzle" and tried to persuade Elima to participate. (*Id*. at 112:11-113:20.) Walton got on the phone and told Elima to take his uncle then "hurry up and come." (*Id*. at 113:21-24.) There were more communications between Elima, Johnson, and LaForest, but Elima did not end up participating in the robbery. (*Id*. at 120:15-17.) LaForest later told Elima that the robbery occurred, and that LaForest made $10,000. (*Id*. at 130:25-131:7.) Dent also testified that the robbery was a success and that "[w]atches were acquired." (Transcript 8/31/17 Vol. II at 27:5.)

Eric Hoppingarner, an employee of Westime West Hollywood, testified that he was working the day of the robbery. (Dkt. 1047 [Transcript 8/30/17 Vol. I] at 57-58.) Mr. Hoppingarner testified that three men wearing construction vests entered the store. (*Id*. at 59.) One of the men was armed with a gun. (*Id*.) One man told him to get to the ground and, "asked [him] if [he] wanted to die that day." (*Id*.) The two other men also ordered him to the floor and then smashed the watches cases, grabbed the watches, and fled. (*Id*.) The Government also introduced security camera footage of the robbery that corroborated Mr. Hoppingarner's testimony. (*Id*. at 59-60.)

Dent testified that after the robbery took place, LaForest and Walton "were on Ventura Boulevard around a BIG 5, Trader Joe's," (*id.* at 27:8-9), "[t]o meet Max, the buyer," (*id.* at 27:12). Boles testified that the phone associated with LaForest connected with a cell tower in the vicinity of Westime on February 17, 2016, at 12:02 p.m., and subsequently traveled away from the vicinity of the Westime towards the Studio City area, where it hit off a cell tower at approximately 12:21 p.m. (Transcript 9/12/17 Vol. I at 17-25.) The phone associated with Walton was in the Studio City area beginning around 11:35 a.m. the day of the robbery. (*Id.* at 43:1-5.) Around 12:21 p.m., the phone associated with LaForest and the phone associated with Walton were hitting off the same cell towers in the Studio City area, indicating that the phones were "in the same general location as each other." (*Id.* at 44:6-14.) The two phones were also communicating with each other during this time. (*Id.* at 44:9-14.) The phone associated with LaForest also connected to a cell tower in the Studio City area at 1:01 p.m. (*Id.* at 116:14-19.) Leonardo Requejado, a defense witness called by Walton, testified that he received a call from the phone associated with LaForest at 1:01 p.m. on February 17, 2017. (Dkt. 978 [Transcript 9/12/2017 Vol. II] at 9:1-10:19; Ex. 218 at 525.) Mr. Requejado was attempting to sell a car at the time and other people were calling him about the car. (Transcript 9/12/2017 Vol. II at 7:15-8:15.)

Dent also testified that Johnson, Walton, LaForest, Stanley Ford, and Dent later met up in the parking lot at Ladera Center to "split up the proceeds" from the robbery. (Transcript 8/31/17 Vol. II at 28:24-29:6.) Dent received a total of $60,000 for the watches stolen from Westime. (*Id.* at 28:14-23.)

## B. The Del Amo Robbery

Dent testified that Walton first told him about the Ben Bridge Jeweler in the Del Amo mall as a potential robbery target. (Transcript 8/31/17 Vol. II at 39:4-18.) Walton

told Dent that he and "Tommy" were going to look at the store later that night. (*Id*. at 39:19-22.) Walton called Dent later that night and said that the location "appeared fine to him." (*Id*. at 39:23-40:1.) Cell site data indicated that Walton was in the vicinity of the Del Amo mall on February 24, 2016. (Ex. 203I.) Phone records indicate that Dent and Walton made a series of calls to each other that day between 7:34 p.m. and 10:06 p.m. (Ex. 208 at 319.)

On February 25, 2016, LaForest contacted Elima and told him to meet at Walton's house. (Transcript 8/23/17 Vol. I at 21:22-23:13; Ex. 135K [text message from LaForest to Elima stating that Elima and LaForest "ha[d] to be at Fly [code name for Walton] before 8"].)[3] When Elima arrived at Walton's house, Johnson, Dent, LaForest, and Walton were there. (Transcript 8/23/17 Vol. I at 23:14-25.) The men discussed the robbery of the Ben Bridge Jeweler in the Del Amo mall. (*Id*. at 24:2-3.) Specifically, Walton told Elima he "messed up last time" and said he could "redeem himself" by participating in this robbery. (*Id*. at 24:4-25:7.) Walton suggested that they go to a Ralphs grocery store parking lot about two minutes from Walton's house so they could "finish the conversation." (*Id*. at 25:20-26:7.) Walton, Johnson, LaForest, Dent, Ford, and Elima then met up at the Ralphs parking lot. (*Id*. at 26:15-20.) There, the men discussed the robbery again and Walton told Elima and LaForest to scout out the location. (*Id*. at 25:15-19, 27:2-22.) Elima and LaForest went to the Ben Bridge Jeweler in the Del Amo mall later that day to scope out the store, plan exit routes, and pick a switch-off spot where the stolen items would be handed off. (*Id*. at 28:10-33:19.) Dent testified he did not recall any discussion about a gun being used in the Del Amo robbery. (Transcript 8/31/17 Vol. II at 41:20-23.)

//

---

[3] At some point, Johnson also called Elima and told him to come to Walton's house. (Transcript 8/23/17 Vol. I at 20:9-21:19.)

On February 26, 2016, Walton told Dent that he planned to meet with his attorney and speak with the government that day about his knowledge of other crimes, such as a robbery in Century City. (Transcript 8/31/17 Vol. II at 44:18-46:18.) That same day, Johnson, LaForest, Evan Scott, Michael Germeille, Cornell Stephen, and Elima met at Morningside Park in Inglewood, California. (Dkt. 1045 [Transcript 8/23/17 Vol. I] at 38, 42; Dkt. 1046 [Transcript 8/29/17 Vol. I] at 99, 114.)[4] During this meeting, Johnson discussed the Del Amo robbery. (Transcript 8/23/17 Vol. I at 38.) Johnson assigned the following roles for the robbery: Elima would be the getaway driver, Scott would be the gunman, and Stephen, with another man named Shane Lewis, would smash the glass cases in the store. (Id. at 38–39.) Johnson had a firearm at the meeting, and told Elima that it would be "the element of surprise." (Id. at 40–41.) LaForest gave Stephen and Lewis each a backpack, hammer, ski mask, and gloves, and to Scott gloves and a ski mask, to use for the robbery. (Transcript 8/29/17 Vol. I at 106–07.) After the meeting, many of the meeting participants traveled to the Del Amo mall, planning to commit the robbery. (Transcript 8/23/17 Vol. I at 42.) However, the robbery was ultimately called off. (Id. at 45.)

On the morning of February 29, 2016, Johnson, LaForest, Henning, Scott, Ford, Lewis, Stephen, and Germeille met at Morningside Park, (Transcript 8/23/17 Vol. I at 49; Transcript 8/29/17 Vol. I at 113, 115), then traveled to the Del Amo mall to commit the robbery, (Transcript 8/23/17 Vol. I at 51; Transcript 8/29/17 Vol. I at 116). That day, Walton asked Dent to meet up with him at his father's tow yard so they "could be on camera during the robbery." (Transcript 8/31/17 Vol. II at 47:14-25; 32:13.) Dent and Walton met up at the tow yard, and later Walton gave Dent security footage of the office in the tow yard to "provide to [their] attorneys down the line if it ever came up." (Id. at 48:4-13.)

---

[4] Elima testified at trial that Henning was present at this meeting, (Transcript 8/23/17 Vol. I at 38, 42), but Stephen testified that Henning was not present, (Transcript 8/29/17 Vol. I at 99, 114).

From the meeting at Morningside Park, Germeille drove Scott, Lewis, and Stephen to the mall, where they parked next to Elima and waited for a phone call. (Transcript 8/29/17 Vol. I at 108, 116.) Once Ford arrived at the mall, he walked into the Ben Bridge jewelry store, then came out and gave "the green light" to go forward with the robbery. (Transcript 8/23/17 Vol. I at 52.) Germeille dropped off the three other men outside the mall and Scott, Lewis, and Stephen went directly into the Ben Bridge jewelry store. (Transcript 8/29/17 Vol. I at 116.) When the robbers reached the store, Scott pulled out a firearm, got the workers to the back of the store, and kept them on the ground. (*Id*. at 116–17.)[5] Lewis and Stephen followed Scott in, smashed the glass cases containing Rolex watches, and grabbed the watches. (Transcript 8/29/17 Vol. I at 116–17.) Scott, Lewis, and Stephen left the store and got into Elima's car, which was waiting outside the mall by the door. (Transcript 8/23/17 Vol. I at 52–53; Transcript 8/29/17 Vol. I at 119.) Elima drove to a designated switch-off spot, where the men met with LaForest, who was waiting in a different car, and gave him the stolen goods. (Transcript 8/23/17 Vol. I at 55–57.) From there, Elima drove to a grocery store and stopped to pull off the paper license plate covering his real plate. (Transcript 8/29/17 Vol. I at 120.) At the grocery store, Scott took the backpack from Stephen, which contained the gun, and left Elima's car to get into Germeille's car, which was behind Elima's car. (*Id*. at 120–21.) Elima then drove Stephen and Lewis to the South Bay Galleria, where they waited for about a minute, then drove onto the freeway back to Inglewood. (*Id*. at 121.) While on the freeway, the state police pulled over Elima's car while Elima, Stephen, and Lewis were inside. (*Id*. at 122; Transcript 8/23/17 Vol. I at 58–59.) All three men were arrested. (Transcript 8/29/17 Vol. I at 122; Transcript 8/23/17 Vol. I at 58–59.) Dent sold the stolen watches from the robbery and gave a portion of the proceeds to Walton. (Transcript 8/31/17 Vol. II at 49:12-23.)

---

[5] Stephen testified that he did not know it was going to be an armed robbery prior to Scott pulling out the firearm. (Transcript 8/29/17 Vol. I at 117–18.)

At the time of his arrest, Elima had a note in his car, provided by LaForest, which contained the names and phone numbers of people who were supposed to participate in the Del Amo robbery.  (Transcript 8/23/17 Vol. I at 62–63, 64–65.)  Walton was not listed on the note.  (*Id*.)  Stephen testified that he never met Walton or spoke with him, (Dkt. 966 [Transcript 8/29/17 Vol. II] at 49), and that he was recruited by LaForest, (Transcript 8/29/17 Vol. I at 94:8-21).  After Elima was arrested, Dent testified that Walton told "everyone -- a few of us" to block Elima's number.  (Transcript 8/31/17 Vol. II at 43:2-10.)

## C.  The Santa Monica Robbery

Dent testified that Walton made the decision to conduct the robbery of the Ben Bridge Jeweler in the Santa Monica Mall in April 2016.  (Transcript 8/31/17 Vol. II at 59:8-19.)  Walton told Dent that he needed a "victory," or a "[l]arge payday," before he self-surrendered to Mendota Federal Prison in May.  (*Id*. at 59:20-60:2.)  Walton contacted Johnson about finding a driver and a vehicle, and asked Johnson to call Mariah Smith.  (*Id*. at 60:5-14.)  Johnson's girlfriend called Smith and told her that Walton wanted to speak with her.  (Dkt. 1052 [Transcript 9/7/17 Vol. I] at 16:7-17:10.)

On April 23, 2016, Walton texted Dent "Bat," which Dent understood to mean he should call from his prepaid phone in order to "talk about criminal activity."  (Transcript 8/31/17 Vol. II at 62-63.)  That same day, Smith went to Johnson's house and met with Johnson, Walton, and Dent.  (*Id*. at 64:12-19; Transcript 9/7/17 Vol. I at 20:16-21:3.)  Walton asked her to drive to and from the robbery, and told her that she would be paid.  (Transcript 9/7/17 Vol. I at 21:18-22:11.)  Smith agreed to drive to the location and to be a getaway driver.  (Transcript 8/31/17 Vol. II at 60:19-21.)  Johnson was to take the bag of stolen goods and drive it to West Hollywood or Sunset after the robbery was completed.  (*Id*. at 64:20-23.)  A man named Vincent Haynes had the role of going inside

the store, breaking the glass, and grabbing the watches. (*Id*. at 66:2-16.) At first, Haynes expressed hesitation about participating, but Walton "pleaded with him to participate," and ultimately "called him a bitch for not participating." (*Id*. at 66:17-67: 7.) A man named Kenneth Paul had the role of recruiting as well as taking over the bag of stolen goods and passing it off to Johnson. (*Id*. at 67:8-12.)

On April 24, 2016, Walton texted Dent, "Good morning player. Waiting on you." (Transcript 8/31/17 Vol. II at 63:3-15.) Dent testified that Walton was "waiting" on him to finish grabbing the final necessities for the robbery later that day. (*Id*. at 63:16-17.) Dent went to Walton's house early that morning, and then drove with Walton to purchase items to conduct the robbery. (*Id*. at 67:15-21.) The two men also went by Johnson's house to "fine-tun[e] [] the communication." (*Id*.) Smith also went to Johnson's house and briefly met with Walton. (Transcript 9/7/17 Vol. I at 23:8-12.) The phones associated with Johnson and Walton were in the vicinity of Johnson's house around 12:00 p.m. (Transcript 9/12/17 Vol. I at 78.) Around noon, Dent and Walton went to Paul's house where Smith, Haynes, Paul, and Brandon White were present. (Transcript 8/31/17 Vol. II at 67:22-24; Transcript 9/7/17 Vol. I at 23-24.) They decided that more equipment was needed, so Walton and Dent left and again drove to get more items. (Transcript 8/31/17 Vol. II at 68:2-10.) Everyone then met up at Queen Park. (*Id*. at 68:10; Transcript 9/7/17 Vol. I at 25-26.) Walton instructed Haynes to jump over the counter in the store and to hit the display cases from the inside, rather than the front or top. (*Id*. at 68:23-8.) Walton also explained exactly where the robbers were going, that it would be a "smash and grab" robbery of the jewelry store, what streets to take, and who would be participating. (Transcript 9/7/17 Vol. I at 26, 32.) Walton gave White and Haynes bags of clothing and a backpack, and instructed them not to touch anything without gloves. (*Id*. at 26:23-27:10.) The phones associated with Johnson and Walton were in the vicinity of Queen Park around 4:22 p.m. and 4:24 p.m. (Transcript 9/12/17 Vol. I at 78-79.)

Smith, Haynes, White, and Paul traveled in two cars to the Santa Monica Mall. (Transcript 9/7/17 Vol. I at 27:11-28:10.)  White and Haynes left the car dressed in the clothes Walton had provided, and were gone for about two minutes.  (*Id*. at 31:19-32:1.) Irene Passos, who was working as an employee of the Ben Bridge Jeweler in the Santa Monica Mall on April 24, 2016, testified that the store was robbed that day.  (Dkt. 974 [Transcript 9/06/17 Vol. II] at 101.)  From the back room of the store, Passos observed two robbers enter the store and smash the glass cases with sledgehammers.  (*Id*. at 101-102.)  The Government also admitted security camera footage of the robbery.  (*Id*. at 103-105.)  Haynes and White returned and got into Smith's car; they were carrying two backpacks and were out of breath.  (Transcript 9/7/17 Vol. I at 32.)  Smith drove away and got involved in a police pursuit on the 10 East freeway.  (*Id*. at 32:24-33:12.)  Smith was stopped, and Haynes and White got out and ran.  (*Id*. at 33:9-15.)  The three were arrested.  (Transcript 8/31/17 Vol. II at 69:17-22.)[6]

## III.  DISCUSSION

Walton claims that his convictions rest on insufficient evidence.  On a motion for judgment of acquittal, the Court will uphold a conviction if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Reed*, 575 F.3d 900, 923 (9th Cir. 2009) (quoting *United States v. Herrera–Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001)).  "The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high."  *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).

//

---

[6] Elima, Dent, Stephen, and Smith were defendants charged in connection with these robberies and testified as cooperating witnesses for the Government at Walton's trial.

"When viewing the evidence in the light most favorable to the government," the Court "may not usurp the role of the finder of fact by considering how [the Court] would have resolved the conflicts, made the inferences, or considered the evidence at trial." *United States v. H.B.*, 695 F.3d 931, 935 (9th Cir. 2012) (quoting *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc)). "Therefore, in a case involving factual disputes and credibility determinations," the Court "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* (citations omitted). "Notably, it is not the district court's function to determine witness credibility when ruling on a Rule 29 motion." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1174 (9th Cir. 2002) (quotation marks omitted) (Courts applying the rule 29 standard "must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.") Furthermore, the Ninth Circuit has held "that a conviction may be based on the uncorroborated testimony of a single accomplice, so long as it has not reached a point when the witness' qualifications are so shoddy that a verdict of acquittal should have been directed." *United States v. Tam*, 240 F.3d 797, 806 (9th Cir. 2001) (internal quotation and citation omitted).

"Circumstantial evidence 'can be used to prove any fact,' although 'mere suspicion or speculation does not rise to the level of sufficient evidence.'" *United States v. Dinkane*, 17 F.3d 1192, 1196 (9th Cir. 1994) (quoting *United States v. Stauffer*, 922 F.2d 508, 514 (9th Cir. 1990)). "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." *Id.* (citations omitted).

//
//
//

### A. Counts Nine, Eleven, and Fourteen–Robbery

In Counts Nine, Eleven, and Fourteen, Walton was charged with aiding and abetting or conspiring with others to commit the Westime, Del Amo, and Santa Monica robberies, respectively. The elements of a Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) are: (1) the defendant made or induced the victim to part with property by the wrongful use of actual or threatened force, violence, or fear; (2) the defendant acted with the intent to obtain property; and (3) commerce from one state to another was affected in some way. (Dkt. 961 ["Jury Instructions – Given"], Court's Instruction No. 33; Ninth Circuit Model Criminal Jury Instruction No. 8.143A.) The jury was instructed that a defendant may be found guilty of Hobbs Act robbery even if the defendant personally did not commit the act or acts constituting the crime, but aided and abetted in its commission. (Jury Instructions – Given, Court's Instruction No. 36.) The elements of aiding and abetting a Hobbs Act robbery are: (1) interference with commerce by robbery was committed by someone; (2) the defendant aided, counseled, commanded, induced or procured that person with respect to at least one element of interference with commerce by robbery; (3) the defendant acted with the intent to facilitate interference with commerce by robbery; and (4) the defendant acted before the crime was completed. (*Id*.; Ninth Circuit Model Criminal Jury Instruction No. 5.1.) Walton challenges the sufficiency of the Government's evidence on the second element–whether Walton aided, counseled, commanded, induced or procured a person who committed the robbery. (*See generally* Mot. at 7–12.)

The jury was also instructed that a defendant may be found guilty of Hobbs Act robbery based on conspiracy responsibility. (Jury Instructions – Given, Court's Instruction No. 37.) The elements required to prove conspiracy responsibility for Hobbs Act robbery are: (1) a person committed the crime of interference with commerce by robbery as alleged in the count under consideration; (2) that person was a member of the

conspiracy charged in Count One; (3) that person committed the crime of interference with commerce by robbery in furtherance of the conspiracy; (4) defendant was a member of the same conspiracy charged in Count One at the time the offense charged in the count under consideration was committed; and (5) the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement. (*Id.*; Ninth Circuit Model Criminal Jury Instruction No. 8.25.) Walton challenges the sufficiency of the Government's evidence on whether Walton was a member of the conspiracy. (*See generally* Mot. at 6–12.)

The evidence shows that Walton played a key role in each of the three robberies for which he was convicted. Based on this evidence, a rational trier of fact could conclude that the essential elements of a Hobbs Act robbery were met beyond a reasonable doubt under an aiding and abetting theory of responsibility or a conspiracy theory of responsibility for the Westime, Del Amo, and Santa Monica robberies.

### i. The Westime Robbery

The Government presented evidence that Walton was an active participant in planning and executing the Westime robbery and that he performed multiple acts to aid and abet its commission. Specifically, Walton helped plan the Westime robbery with Dent, Johnson, and Elima at Walton's home. Walton scouted the location for the robbery. He told Elima he would be paid $15,000 for participating. He also served a key role–arranging LaForest's meeting with a buyer to sell the stolen watches. Cell tower data corroborated that Walton served this role, as he was near LaForest in Studio City when LaForest met with the buyer. Walton was also present when the proceeds from the robbery were divided, from which a trier of fact can infer he was paid for his participation in the robbery. Additionally, although Elima did not participate in the robbery or the attempted robbery, Elima communicated with Walton on multiple

occasions to confirm the robbery details and Walton pressured him to participate.

The Government's evidence was also sufficient to find that Walton was a member of the conspiracy to commit the Westime robbery and acted pursuant to that agreement to help commit the robbery. The evidence showed that Walton entered into an agreement with Dent, Johnson, and Elima to commit the Westime robbery. Walton helped coordinate the robbery with other co-conspirators, and participated in the conspiracy by, among other things, arranging for the sale of the stolen watches.

Walton argues that the Government failed to prove Walton participated in the Westime robbery because it relied on Elima's testimony regarding Walton's attendance at the planning meeting for the robbery. (Mot. at 7.) Walton argues that Elima's entire testimony was unreliable because he testified that Dent attended the meeting, but the phone associated with Dent was pinging a cell tower in Anaheim during that time. (*Id.* at 7–8.) Walton's argument goes to Elima's credibility as a witness, which the Court does not independently assess when reviewing the sufficiency of the evidence. *See H.B.*, 695 F.3d at 935 ("in a case involving factual disputes and credibility determinations," the Court "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."). In any event, the discrepancy between Elima's testimony and the cell site data on this issue does not justify rejecting Elima's other testimony regarding the Westime robbery. *See Tam*, 240 F.3d at 806. Whether or not Elima was accurately recalling Dent's presence at the meeting, Elima's testimony that Walton was present is not called into question as it was corroborated by cell site data placing Walton near his house during the meeting.

Walton also argues that his presence in Studio City near LaForest after the robbery took place can be explained by LaForest inquiring about Mr. Requejado's car that was for sale. (Mot. at 8–9.) However, "the mere fact that evidence submitted by the government

is wholly susceptible to innocent explanations . . . is not enough to reverse a conviction. . . . As long as the jury could have accepted a culpable explanation consistent with the proof of defendant's conduct, [the Court] must assume, in the prosecution's favor, that the jury did so." *United States v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010) (internal citations and marks omitted). Dent's testimony that the participants decided Walton would arrange a meeting between the buyer and LaForest, coupled with cell site data that corroborates Walton's location in Studio City after the robbery, is sufficient to draw the inference that Walton was in Studio City to arrange the meeting with the buyer. Moreover, Walton and LaForest's time in Studio City could have included both a meeting with the buyer and inquiring about the car. The Government's evidence supports the inference that Walton went to Studio City to arrange the meeting of LaForest and the buyer, a crucial step in completing the robbery. For the Court to discount this inculpatory explanation would be error. *See United States v. Nevils*, 598 F.3d 1158, 1166-67 (9th Cir. 2010) (noting that it is error for a reviewing court to "consider[] whether the evidence produced at trial may be innocently explained" and adopt an exculpatory explanation when the evidence is also susceptible to an inculpatory inference).[7]

### ii. The Del Amo Robbery

The Government presented evidence that established that Walton was an active participant in planning and directing the Del Amo robbery and that he performed multiple acts to aid and abet its commission. More specifically, Walton selected and scouted the Ben Bridge Jeweler at the Del Amo mall as a robbery target. Cell site data corroborated that Walton scouted the mall. Walton, Johnson, Dent, LaForest, and Elima met at

---

[7] Walton's citation to *United States v. Delgado*, 357 F.3d 1061 (9th Cir. 2004) is unpersuasive. (Mot. at 9.) The Ninth Circuit overruled the relevant principle of *Delgado* in *United States v. Katakis*, 800 F.3d 1017, 1028 (9th Cir. 2015). *Id.* ("[F]ollowing our decision in *Nevils,* authority indicating that we may find the evidence insufficient to convict where there is an innocent explanation for inculpatory conduct, such as *United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir. 2004), is no longer viable.")

Walton's home to plan the robbery. Walton told Elima he could "redeem himself" for not participating in the Westime robbery, and told Elima and LaForest to scout out the Del Amo location. Walton also directed the men to move the meeting from his house to a nearby Ralphs parking lot. Walton was paid a portion of the proceeds from the robbery after Dent sold the watches.

The Government's evidence was also sufficient to find that Walton was a member of the conspiracy to commit the Del Amo robbery and acted pursuant to that agreement to help commit the robbery. Walton entered into an agreement with Dent, Johnson, Elima, and LaForest to commit the Del Amo robbery, he selected the robbery target, he helped coordinate the robbery with other co-conspirators, and he profited from the conspiracy's success.

Walton argues that the Government failed to present certain evidence, but does not attack the evidence the Government did present. First, Walton argues that Stephen, one of the robbers who entered the store, did not know Walton, raising the inference that Walton did not participate. (Mot. at 9–10.) However, the fact that one of the participants did not know Walton does not negate Walton's role in selecting the location and planning the robbery. The evidence at trial demonstrated that Walton generally coordinated robberies from a distance and relied on others to manage the men who entered the stores. For the same reason, the fact that Walton's name did not appear on Elima's list of participants can be explained by Walton's removed, organizational role. (*Id*. at 10.)

Second, Walton argues that there is no cell site data that places Walton near the Del Amo mall on the day of the robbery attempt or the actual robbery. (*Id*. at 10.) The Government's evidence showed that Walton sought to create a false alibi for the day of the actual robbery, when he directed Dent to come to the tow yard so that they could be captured on security tape while the robbery occurred. Walton also communicated to Dent

his plans to speak with the government the day of the attempted robbery. Thus, the lack of cell site data placing Walton near the Del Amo can be explained by his deliberate decision to be far from the site of the robbery and distance himself from its commission. Contrary to Walton's assertion, the fact that he was not physically present on the day of the robbery or the robbery attempt does not negate his role in planning the robbery.

### iii.  The Santa Monica Robbery

The Government presented evidence that Walton was an active participant in planning and directing the Santa Monica robbery and that he performed multiple acts to aid and abet its commission. Walton helped plan the robbery of the Ben Bridge Jeweler in Santa Monica. He selected the location as a robbery target and wanted a "victory" before he went into custody. He attended multiple planning meetings for the robbery; Dent and Smith's testimonies are consistent and corroborative on this point. Cell site data corroborated that Walton was in the vicinity of the planning meetings the day of the robbery. Walton also recruited Smith to be the driver. Walton also pressured Haynes to participate in the robbery when Haynes expressed reservations. Walton also helped prepare for the robbery by purchasing items for the robbers' use, such as hammers and clothing. Walton also instructed Haynes on how to smash the glass cases containing the watches. Walton also gave Haynes and White the clothing and hammers they would use during the robbery, instructing them not to touch anything without gloves.

The Government's evidence was also sufficient to find that Walton was a member of the conspiracy to commit the Santa Monica robbery and acted pursuant to that agreement to help commit the robbery. Walton entered into an agreement with Dent, Johnson, Smith, Haynes, Paul, and White to commit the Santa Monica robbery, he selected the robbery target, and he helped coordinate the robbery with other co-conspirators. Walton also participated in the conspiracy by instructing the robbers on

how to steal the watches and providing the robbers with clothing and hammers for use during the robbery.

Walton again attacks the Government for not presenting certain evidence, while ignoring the substantial evidence of his active participation in the Santa Monica robbery. First, Walton argues that the Government only presented one "cryptic" text from Walton to Dent to show he was involved. (Mot. at 11.) This argument is belied by the other text messages the Government presented. Second, Walton argues that the Government did not present (1) any cell site data for Smith's phone to corroborate her presence at the planning meetings and her conversations, (2) any video from the pole camera installed outside Johnson's house, and (3) any DNA or fingerprint evidence that could tie Walton to the backpack or its contents used in the robbery. (*Id*. at 11–12.) Walton's argument ignores that the evidence the Government *did* present is sufficient to prove beyond a reasonable doubt that Walton was an active and intentional participant in the Santa Monica robbery. Lastly, Walton attacks the credibility of Smith's testimony, which the Court does not review on a motion for acquittal absent exceptional circumstances, which Walton has not shown here. (Mot. at 12.) And in any event, Smith's testimony was corroborated by Dent's testimony and by cell site data. *See Tam*, 240 F.3d at 806 (denying a Rule 29 motion and noting that "the jury was aware of the witnesses' involvement in the scheme as well as their potential biases when it made its credibility finding" and that "independent evidence corroborated several aspects of the [cooperating] witnesses' testimony").

**B.  Count Twelve–Section 924(c)**

In Count Twelve, Walton was charged with aiding and abetting or conspiring with others, who knowingly brandished a firearm during and in relation to the Del Amo robbery. The elements of using or carrying a firearm during and in relation to, or

possessing a firearm in furtherance of, a crime of violence, under 18 U.S.C. § 924(c) are: (1) the defendant committed the crime of robbery, which is a crime of violence; (2) the defendant knowingly possessed a firearm in furtherance of, or used or carried a firearm during and in relation to the crime of robbery. (Jury Instructions – Given, Court's Instruction No. 38; Ninth Circuit Model Criminal Jury Instruction No. 8.72.)

Walton's conviction for violating § 924(c) can be sustained under an aiding or abetting theory[8] or a conspiracy theory of responsibility, even if he never personally possessed a firearm. Since the Government presented sufficient evidence to show that Walton was a member and participant in the conspiracy to commit the Del Amo robbery, Walton may be held "criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy," including a violation of § 924(c). *United States v. Allen*, 425 F.3d 1231, 1234 (9th Cir. 2005) (internal quotations and citations omitted). To find Walton criminally responsible here for the brandishing of a firearm by one of his co-conspirators during the Del Amo robbery, "the government 'is not required to establish that [the defendant] had actual knowledge of the gun'; rather, '[t]he touchstone is foreseeability.'" *Id*. (quoting *United States v. Hoskins*, 282 F.3d 772, 776 (9th Cir. 2002) (citation omitted)).

Walton argues that there is no "logical connection" between Walton and the firearm used at the Del Amo robbery, nor is there any evidence that Walton had actual knowledge that a firearm would be used in the robbery. (Mot. at 10–11.) Walton does

---

[8] "[T]o be guilty of aiding and abetting under § 924(c), the defendant must have directly facilitated or encouraged the use of the firearm and not simply be aware of its use." *United States v. Bancalari*, 110 F.3d 1425, 1429–30 (9th Cir. 1997) (internal quotation and citation omitted). The Government's evidence was not sufficient to prove that Walton specifically intended that a co-conspirator use a firearm during the commission of the robbery, or that Walton encouraged the use of the firearm.

not dispute, however, that the use of a firearm during the Del Amo robbery was foreseeable. *(See generally* Mot.)  Nor could he have reasonably done so.

First, the general circumstances and nature of the robbery make the use of a gun foreseeable.  The robbery was a takeover-style robbery in broad daylight in a shopping mall with security guards, making it reasonable to infer that such a robbery would require some credible threat of deadly force, such as a firearm.  *See Allen*, 425 F.3d at 1234 ("it is reasonable to infer from the nature of the plan–the overtaking of a bank by force and intimidation–that guns would be used"); *United States v. Alvarez*, 755 F.2d 830, 849 (11th Cir. 1985) (finding that given the nature of the conspiracy to sell a large quantity of cocaine for a substantial amount of money, the jury was able to infer that the use of a weapon and deadly force was reasonably foreseeable); *United States v. Dixon*, 982 F.2d 116, 120 (3d Cir. 1992) ("[The defendant] had a duty to anticipate or foresee that a bank robbery in broad daylight would require some credible threat of deadly force.  Standard foreseeability analysis does not require [the defendant] to foresee the precise means the perpetrators he aided would use in making the threat of harm credible enough to overcome the victim's willingness to resist.").

Additionally, Walton was a key planner and organizer in the conspiracy to commit the Del Amo robbery.  *See Hoskins*, 282 F.3d at 776, *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) ("In order for [the defendant] to be found vicariously liable for the § 924(c) offense, he must have had a sufficiently high level of involvement in the robbery.").  Walton's position in the conspiracy supports the inference that he must have known that a firearm would be used in the robbery.  Walton was also in regular communication with his close associate, Johnson, who supplied the firearm and had participated in other armed robberies involving the same conspirators.  *See Id*. at 777 (noting that the "foreseeability of the use of a gun" was supported by the fact that the defendant "was involved in a romantic relationship with [a

co-conspirator] who had participated in a series of previous armed K Mart robberies that involved many of the same conspirators who planned the [] robbery [at issue]"); *Allen*, 425 F.3d at 1234 (noting that the defendant "had a longstanding friendship with [a] co-conspirator [] who had participated in previous armed bank robberies"). Simply put, "there is considerable evidence evincing [Walton's] intensive involvement in the robbery's planning and execution, as well as a sufficient basis to conclude that use of a gun was foreseeable." *See Hoskins*, 282 F.3d at 777.[9]

## C. Count One: Conspiracy to Commit Hobbs Act Robbery

In Count One, Walton was charged with conspiracy to interfere with commerce by robbery in violation of 18 U.S.C § 1951(a). The elements for conspiracy to interfere with commerce by robbery were as follows: (1) beginning on an unknown date and ending no later than or about June 3, 2016, there was an agreement between two or more persons to commit the crime of robbery; (2) the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose; and (3) the robbery contemplated by the agreement would affect interstate or foreign commerce in some way. (Jury Instructions – Given, Court's Instruction No. 28; Ninth Circuit Model Criminal Jury Instruction No. 8.20.)

The Government presented substantial evidence of Walton's guilt on the conspiracy count. The evidence established beyond a reasonable doubt that Walton entered into an agreement with many individuals to carry out the Westime, Del Amo, and Santa Monica robberies. Walton helped plan and organize the robberies. He in many instances supplied the items necessary to commit the robberies, he recruited and

---

[9] At the hearing, Walton's counsel argued that there was no evidence that the firearm used in the Del Amo robbery was, in fact, a real firearm. However, Elima testified that Johnson handed him the firearm used in the Del Amo robbery on February 26, 2016, and that the firearm was a 9 mm semi-automatic gun. (Transcript 8/23/2017 Vol. 1 at 43:17-44:4.)

instructed the other participants, he scouted out the target locations, and he helped facilitate the sale of the stolen merchandise.

Walton again challenges the sufficiency of the Government's evidence establishing his guilt for the crime. (Mot. at 6–7.) He reiterates his arguments regarding certain evidence the Government failed to present, (i.e. recorded phone conversations or text messages or cell site data placing Walton at the scene of a robbery), and his argument that the Government's cooperating witnesses were not credible. Walton asserts at bottom the Government's evidence amounts to Walton's "mere knowledge" of Dent's illegal activities and Walton's "mere association" with the other defendants. (*Id*.) But Walton's assertion ignores the substantial evidence the Government presented of specific actions Walton took to plan, organize, and facilitate each of the three robberies for which he was convicted. Contrary to Walton's assertion, there was more than sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that Walton played a key role in the Westime, Del Amo, and Santa Monica robberies, and was an active member of the conspiracy to commit those robberies.

**IV. CONCLUSION**

For the foregoing reasons, Defendant Walton's motion for acquittal is DENIED.


DATED:     January 24, 2018


_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE